## MATTHEW CONNOR ET UX.
### V.
## CHARLES A. AKIN, ADMINISTRATOR.

*Administration—Action by Administrator Charging the Embezzlement of Intestate's Funds.*

1. In an action commenced under Secs. 81 and 82, Chap. 3, Starr & C. Ill. Stats., the County Court has no power to make its judgment a lien by a specific order on defendant's real estate and the Circuit Court has no more power in the premises than has the County Court.

2. The judgment of the court below, being unsupported by the evidence, is reversed, and the case having been tried three times, is not remanded.

[Opinion filed February 4, 1890.]

IN ERROR to the Circuit Court of Franklin County; the Hon. GEORGE W. YOUNG, Judge, presiding.

Messrs. THOMAS J. LAYMAN and W. J. N. MOYERS, for plaintiffs in error.

Messrs. C. H. LAYMAN and W. H. WILLIAMS, for defendant in error.

REEVES, P. J.    This case was before us at the August term, 1888, and was reversed for the reason that the evidence did not sustain the judgment of the Circuit Court. We have carefully examined the record now before us and considered all the testimony found in it.

This is a proceeding commenced under sections 81 and 82, chapter 3, Starr & Curtis' Statutes, volume 1, page 226. The cause was heard in the County Court and the plaintiffs in error were discharged and the administrator appealed to the Circuit Court, and upon the second trial in the Circuit Court, a judgment was entered against plaintiffs in error for $1,657, and to reverse this judgment this writ of error was sued out. The order of the Circuit Court makes the judgment a lien upon all the real estate of plaintiffs in error, except their homestead. The authority of the Circuit Court in the matter is no greater than that given by the sections of the statute above cited to the County Court, and we hold that the statute does not give the County Court authority to make its judgment a lien by a specific order.

The evidence shows that D. F. Hammons died intestate July 17, 1875, and left surviving him, Sarah, his widow, and Lewis, Joseph and William, his sons, and Julia Connor, his daughter. Lewis died January 23, 1878, under twenty-one years of age. Abner Rea was appointed administrator of D. F. Hammons. It is agreed that said Rea, administrator, in settlement of D. F. Hammons' estate, paid his widow, Sarah, the following amounts:

Oct. 28, 1875,  Cash award ....................... $  425.70
Nov. 17, 1875,   "    distribution ................    800.00
Dec. 4, 1875,    "       "       ................    400.00
Mar. 22, 1876,   "       "       ................    240.00
Sept. 11, 1876,  "       "       ................    484.26

Connor v. Akin.

| | | | |
|---|---|---|---|
| Feb'y 5, 1877, Cash distribution............... | | | 126.60 |
| Ap'l 4, 1877, " " , ............... | | | 220.00 |
| " " " " " ............... | | | 237.50 |
| " 18, 1877, " " ............... | | | 38.80 |
| Balance of specific award in property........... | | | 471.30 |

Making a total of.................................. $3,444.16

A part of these payments were certain notes which Rea, administrator, turned over to her as cash. The old lady died April 6, 1878. No administration was had upon her estate until August 26, 1887. In order to get a connected view of the testimony, we shall summarize it. Matthew Connor was the first witness examined and testified in substance, that he had no goods, money, chattels or anything whatever in his possession belonging to Sarah Hammons, deceased; she left no property except a bed, bed quilt and pillow; that she gave to Julia Connor. All her other property she divided up and gave to her children before her death. One division was made at Connor's house, a short time before Mrs. Hammons' death; this division was of notes she held; the Dan Browning note of $400, the Drew Bacon note of about $330, the Joseph Samples note of $200, and the William Walker note about $240.

Joseph and William Hammons, Julia Connor, Mrs. Hammons and Matthew Connor were present. Joseph got the Dan Browning note, Julia and Matthew Connor got the Drew Bacon note, and William Hammons got the Samples and Walker notes. Mrs. Hammons said at this time that she had kept some fifty or sixty dollars, which would be all that she would need. Mrs. Hammons stayed most of the time for eighteen months before her death, at her daughter's; part of the time she was with Joseph and part of the time with William. Matthew Connor bought Joseph's interest in some land, of which D. F. Hammons died seized. There were some old notes of the estate which the administrator did not collect. These were given to Joseph for his interest in this land. Don't recollect certainly about that trade. Matthew Connor also bought William Hammons' interest in this land, but could

not state on the stand what he paid him or how it was paid. He also bought the land of the estate when it was sold under order of court—550 acres. He paid $2,505; ten per cent down, and for the balance gave a note with Abner Rea as security, due in one year. The sale was December 13, 1875. Mrs. Connor got her share out of her father's estate, $1,200 or $1,500. Connor sold over $600 worth of hogs, which, with the proceeds of wheat crop, were applied on the Rea note. The balance due on note at maturity unpaid, Connor and his wife afterward paid to Rea. The title to forty acres of this land, perhaps eighty acres, was in Mrs. Connor. She had one-fourth interest in it when it was sold. Connor and wife and Joseph and his wife, and William and his wife, all conveyed to Lewis. When he died his property was divided up among the heirs, and each got his part of it. Connor built a house that cost about $1,000, bought a hack for $90 or $95, bought farming implements, built in partnership with Buckner a grain house at Buckner, at cost to him of $190; afterward bought interest of Buckner in grain house for $150. His taxes for ten years averaged about $50 per year. He sold some of the land; sold forty acres to the old lady, and by her direction made the deed to Lewis and she paid him $200 for it. He sold thirty acres to Jones, traded some of the land with Bacon and got $300 in boot money. He sold eighty acres to Andy Flatt for $1,000.

During these years he was cultivating 200 acres of land in crops. The old lady and Lewis lived on part of the lands of the estate for two years after her husband's death, and kept hired help, both male and female. Connor had also been drawing a pension for four or five years, and received for back pensions $830, besides the $200 Mrs. Hammons paid him for land deeded to Lewis, and the $1,200 of notes that were divided up before her death. She bought a wagon for $80; then the expenses while she was running the farm and doctor's bills. She was sick a great deal; then the note on Uncle Kaywood Davis, which she took up and made a present to Davis. Connor stated he knew from what she told him that she sent money to her brothers in Hamilton county. She

Connor v. Akin.

also paid a doctor's bill and tombstone for Dr. Hammons for $100. Connor gave his wife a note for the $1,200 of her money, which went toward payment of the land, bought of the estate. Connor further testified that when he first heard that this suit was to be brought, and heard what some parties would swear to, he concluded that they had made it up to swear to a lie to beat him, and he made a deed of his land to his son. This deed was never delivered and afterward destroyed.

Julia Connor testified, in substance: I never, since the death of my mother or before, concealed or embezzled in any way any property belonging to my mother's estate. My mother lived with my brother Lewis for about a year before he died. After his death she stayed most of the time with me. She had a bed and trunk at my house. I know she had some money while there—I never knew how much she had. While at my house so far as I know she did not have a considerable sum of money. I don't know what she got from my father's estate. She was not expensive in her habits. I can't tell what her expenses were. Her medical bills, medicines and stimulants amounted to quite a sum each year. Lewis' property was divided up shortly after his death at the old house. I do not recollect which division took place first, that of Lewis' property or the division of mother's property. I was present when mother's property was divided. I got the Drew Bacon note; I don't recollect what Joe and Will got. Will did not get the Samples and Walker note for his interest in 147 acres of land, which he conveyed to my husband. Joe got the old notes which administrator did not collect for his interest in 147 acres; I don't recollect when that trade was made. I knew Mrs. Crawford, had known her for twenty years or longer. My husband and I have had some quarrels. I never told Mrs. Crawford that I had $1,600 of mamma's money that Matt will never get his hands on. I might have said that of father's and mother's money. I did not have such a talk with Mrs. Crawford within two or three months after mother's death. I had no such talk with Mrs. Rogers at any time, nor with Mrs. Buckner. I know Emily Dees, she was at my

house when mother died. I did not a week or two after mother's death show Mrs. Dees a sachel, a pocket book, with a roll of money in it, and say that was a roll of money that mamma gave me, and say it was $1,600. I had no such conversation in substance.

I never had the money and never told any one that I did. I have no recollection of telling Mrs. Julia Hammons that I did not know what had become of mother's money. The way I came to get my husband's note for $1,200 was this: There was money coming to me from the administrator of my father's estate. He came to me and wanted me to let it be applied on my husband's note for the land he had bought, at the sale of the land under order of court, on which Rea, the administrator, was security. I agreed to do it, provided my husband would give me his note, which he did, and the money coming to me was applied on the land note. I don't recollect the date of the note. I have it yet but not with me. I have no real estate of my own except the home place. I think the title to all or part of that is in my name. I think Joe conveyed his interest in that to me. Will had an interest in this home place—I guess he conveyed his interest to me. It is so long ago that I don't recollect about it now. William Hammons died December 4, 1883; I don't know that my husband had any land when I married him. I don't know how much he has now; married him twenty-eight years ago. Mother's household goods and other personal property including the notes were divided between Joe, Will and me before mother's death at her request.

Mrs. Crawford testified as follows: I was at Mrs. Connor's shortly after her mother's death. She was joking through the day about their affairs; said she had thrown Matt's clothes out of the window, and he was sleeping at the barn, and she spoke as though he was getting away with her father's estate; but, says she, "I have got $1,600 of mamma's money that Matt will never get his fingers on." When she came to see me, just before the trial in the County Court, I told her that she had said these words, and she said she did not recollect it and did not mean it. She often spoke, she said, of mother's money or father's money,

and if she said it, as I have stated, she did not mean it.    Have
never been intimate with Mrs. Connor—visited very little.
There has been a good deal of bad feeling between my family
and that of Matt Connor since the death of Mrs. Hammons,
the old lady.    While Mrs. Connor was at my house just
before the trial in the County Court, Matt Connor came
there, and when I said what his wife had told me about
trouble between them, and her having $1,600, he said it was
not true, if she had said it; "but I don't say I never had any
trouble with her right along when I borrowed $1,200 of her,
and gave her my note for it."    I never spoke of this conver-
sation outside of my own family until the summer of 1887,
when I told Mrs. Julia Hammons.

Mrs. Sarah Rogers testified:    Have known Connor and
his wife by sight for twenty-five years; am not personally
acquainted with them.    I was at their house in 1882 on an
errand.    Mrs. Connor was telling me about her and Matt
having a fuss and said she had between $1,500 and $1,600 in
this house that she was determined Matt should not have the
benefit of.    She said Matt flung up her brothers to her.    Did
not tell Dan Flatt that this talk with Mrs. Connor was
eleven years ago.

William Samples testified:    I went to Mrs. Sarah Ham-
mons' house March 3d before she died in April.    She was
not at Connor's;  I paid her $25 on the Samples note.    Saw
money in her possession; don't know how many dollars but a
right smart roll of it.    She said there was as much as $400.
The money was in bills and lay in the pocket book.    I saw a
$20 bill.    Don't know how many bills there were or their
size but think they were about one-eighth of an inch thick.
I understood John Sanders was living in the old lady's house
with her at that time.

Joseph Samples testified:    I owed Sarah Hammons $200
when she died.    I sent her interest a short time before she
died.    Joe Hammons came to see me about my owing his
mother and when I told him how it was he said he did not
want me as a witness.    In a few days after Matt Connor and
his wife came to see me.    He told me there was a divide;

that Will Hammons got my note and the Walker note and he got the Drew Bacon note and Joe got—now it has slipped my mind what note Joe got. In another conversation I told Matt that I understood Judge Browning borrowed $400 from his mother and he then said that Joe got that note in the divide. About four weeks ago Matt told me he could tell what became of the old lady's money up as high as $2,600.

. Kirkpatrick testified: Know Connor; had some talk with him about time this suit was begun. He told me that they had divided notes before old lady died, and left about $60 in money and she said if that did not cover her burial expenses, they would have to meet them; told me he got Bacon note and Joe got Browning note.

Drew Bacon testified: That he paid his note to Connors and their assignee. I think Mrs. Connor said in November, 1879, that there was $800 of the old lady's money still to collect that they had not divided. My recollection is that she said they had collected and divided $1,600 and there was still $800 to collect and divide.

Joseph Samples recalled: William Hammons said my note had fallen to him. I paid the note to him in part; Joe was present when I paid $75. Will sold balance of note to Rea and I paid him balance. In April, 1878, I took acknowledgment of deed from Joseph and William Hammons and wives to Matt Connor, for their interest in the Lee Crawford land. Don't know what Will got for his interest.

John M. Daniels: Knew Sarah Hammons; saw her last at her son William's; can't tell how long before her death; think before Lewis died. She was in bed, had pocket book in her hand and said she had about $1,500 or $1,600 in the pocket book; she did not say in money; did not say whether in notes or money.

Mrs. Emily Dees: Knew the Hammons and Connors; never had any talk with either of Connors about any money or property that Mrs. Hammons left; at their house frequently; she never showed me a pocket book belonging to her mother until since last trial, when she spoke of it as the pocket book talked so much about in court. Never showed me any money; never said her mother had given her any.

Judge Browning: Borrowed $400 of Mrs. Hammons; I think the note was paid before Mrs. Hammons died; I never paid the note or any part of it to Joe.   May be mistaken as to date of payment.

U. R. Browning: The money was borrowed for me and I paid it; I think I paid it before December, 1877; I paid something to Fayette Rea; it may have been this note; don't think it was.

Mrs. Shelton: Had talk with Julia Connors about five years ago; she cried and said Matt did not allow her brother Will to come into the house; that the house was built with her money, and if Matt did not quit treating her as he did, he should not stay under her roof.

Julia Hammons: Widow of William Hammons; since his death had talk with Julia Connors; she said Abner never paid her mother the money people thought he did; she did not say how much he paid her.   Heard her tell William Hammons the morning the old lady was buried that he and Matt would have to "fix to put her away," as Joe would not do anything. He asked what she had done with her money.   She replied that her mother didn't know anything about handling money and didn't know how to spend it.   Mrs. Connors and I have not been on good terms for some time.   Don't know whether I told Dan Flatt at my home that I had set in to break Matt Connor up, and intended to do it.   I did tell Mrs. Rea that Mrs. Connor had nobody to blame for this suit but herself, because if she hadn't told Mrs. Crawford what she did, we would never have known what became of the money.   I have a minor son who is interested in this suit.

Abner Rea: Was administrator of D. F. Hammons; paid Mrs. Hammons, his widow, what records show.   It was not all paid in property or money by a good deal.   She took notes; some were bad and couldn't be collected.   One $500, on Steve Burton.   She paid $120 to $140 for burial of her husband and for expense of sale.   She receipted to me for $200, and took up one of Joe's notes on which he had forged, as they claimed, her and William's name.   Afterward, Joe adjusted the note and that left me owing the old lady $200; when I

told her about the $200, she said she was awful glad; she had been helping her children and didn't think she would have money enough to pay Matt Conner for the forty acres she had bought of him. This was in September, before she died in April. She was then feeble. The distributive shares of the Hammons estate was about $1,300, also one-fourth of the proceeds of land sold on partition. There were some $2,000 of old notes and judgments belonging to the estate which I could not collect. I turned them over and got credit for them.

Joseph Hammons: Denies that he ever got anything left by his mother. There was no divide of notes; never had Browning or any other note; there was a divide of Lewis' property after his death. I did not know until about a year ago that mother got more than the $800, her specific award from father's estate. Was constable eleven years before my mother died. She was frequently at my house; stayed from two days to a week at a time; was tax collector three years and member of board of supervisors one term. Did not tell Bill Williams, the summer after mother died, that I had the Dan Browning note for $400. Did not tell Canada Rea, a year ago, that I didn't know until the 4th of July before that I had already received all I was entitled to of my mother's estate. Did not tell Abner Rea the same thing. Know nothing about Walker note. Was not present at Aleck Walker's when he paid brother Will the balance of note by the sale to him of horses.

Annie Wilson: Was present at Matt Connor's shortly before the old lady died; Joe and Wid. Hammons were there. After supper they got around the table and had the notes on the table and Joe did the figuring and dividing; don't remember what notes either of them got. The horse and cow was divided; am now twenty-four years old; at the time of this divide was between fifteen and sixteen.

Lucy Harris: Daughter of Mr. and Mrs. Connor, testified substantially same as last witness.

Charity Rea: Know Julia Hammons; she said to me that there would not have been anything about this suit if Julia Connor had not got jealous of her and Matt.

Abner Rea : Joe Hammons told me when he subpœnaed me as a witness that he did not know until the previous 4th of July but he had got all that was coming to him from his mother's estate.

Emily Dees: Knew Mrs. Sarah Hammons' household goods; saw some of them at Joe's house a month or six weeks before she died; saw Mrs. Hammons quite often a few weeks before she died; heard her say they had a divide and she felt much better on account of being no trouble afterward; this was a month or six weeks before she died at Matt Connor's house. Said she was glad Julia got the old horse.

Dan Flatt: Know Julia Hammons; last May at her house in talking about this case in speaking of Connor she said : " I set in to break him up and intend to do it." I am on good terms with Julia Hammons.

Haywood Davis: Knew Sarah Hammons and her household things. I bought some of these things from Joe and Will Hammons and Mrs. Connor before old lady's death. I understood these parties were dividing these things at her request.

Samuel Walker: Know about note given by my brother William to Sarah Hammons; Joe and Will Hammons came to see me about this note in the summer of 1878. My father, who was security on note, sold Will Hammons two large horses and got from him $10 or $15 besides the note.

Wm. Williams: Know Joe Hammons; met him here in Benton, in summer of 1878; we were on a spree and were out of money. He told me he had a note for $400 on Dan Browning and if I could sell it at a share of $20, he would give me $5; met Joe next day; he had his pockets full of money; I asked him where he got it. He said he sold that note to Fayette Rea for $375. I did not count the money. He showed me right smart of it. There was a great big roll of paper money. I saw Mrs. Sarah Hammons a few weeks before she died; wanted to borrow $25 of her. She said she had no money to loan, as she had divided her money and stuff with the children. Was in jail here, for nothing as I look at it. I think it was after Mrs. Hammons' death, I had this

talk about Browning note with Joe. Never told Joe I got $5 from Matt for being a witness.

Jack Connor: Brother of Matt; knew Mrs. Hammons for twenty or thirty years; members same church; visited her about four weeks before her death. In speaking of her property she said she had divided with her children all her notes and money except $50 or $60.

D. Buckner: Know Joe Hammons; soon after this case was tried last spring, he told me he did not expect to get anything out of this law suit from Connor and wife, but he intended to break them up.

Drew Bacon: About March 19, 1878, I paid Mrs. Hammons' interest on my note. Said her property would be divided among her children when she died.

Fayette Rea: I never had the Browning note as I can remember; it seems to me if I had had it in my possession I would remember it.

The plaintiffs in error deny that they have in their possession or ever had any money or effects belonging to the estate of Sarah Hammons. This denial is sought to be overcome by the direct testimony of Mrs. Crawford and Drew Bacon as to Mrs. Connor, and by showing that Mrs. Hammons received a large sum of money from Dr. Hammons' estate which she did not spend, and which she had a short time before her death. It appears to us quite clearly established that she did not receive the amount of money which defendant in error claims she did. The total amount receipted for by her to the administrator was $3,444.16. From this should be deducted $471.30, amount of personal property taken by her on her award. Then the administrator testifies that she receipted for $120 to $140, which was applied to pay burial expenses of Dr. Hammons and the expenses of getting up the sale of the property. The administrator says she did not get in cash all that she receipted for as cash " by a good deal; she had some bad notes that could not be collected. One $500 note on Steve Burton."

It is conceded that she held the Browning, Bacon, Walker and Samples notes amounting to $1,170. Mrs. Connor swears she took a note on her brother, Kaywood Davis, and gave it to

him. The amount of this note is not given. She paid $50 for tombstone, $70 for wagon. She was under care of physician for quite a time and paid doctor's bills. She found it necessary to use a large amount of stimulants during her long illness. She lived with her minor son on home farm for several years and kept hired help on the farm and in the house. She paid $200 for land for her son Lewis. The amount she took Burton's note for is not clear. Rea says it was $500. Connor swears she took $300 of it. Others say she only took it for $100. At this time, eleven years after Mrs. Hammons' death, it is not to be expected that any accurate statement of the disposition of the money, notes and property she received from her husband's estate can be made. This evidence does not furnish the data upon which such statement can be made. The fact that it can not be shown what she did with her property and money, while proper to be considered, does not furnish a sufficient basis upon which to charge plaintiffs in error in this proceeding. There does not seem to us to be any force in the effort to show that the Connors did not have the money of their own to pay for land they bought, house and other improvements, taxes and their living. We think the testimony shows income from their own resources to meet all these outgoes. Mrs. Connor's share of her father's estate was ....................................... $1,300.00
She was entitled to ¼ of what land sold for in partition.................................................. 625.00
She received her share of her brother's estate.... 650.00

$2,575.00
Mr. Connor swears that he received pension.... $830.00
He sold hogs amounting to..................... 600.00
He sold in four years about 2,500 bushels wheat.... 1,500.00
He sold land to Jones and Mrs. Hammons........ 1,200.00

$6,705.00
This would seem to be sufficient to cover payment for land, all improvements made, taxes and their living expenses.

Upon the question of the amount of money Mrs. Hammons

had when she died, Mr. Daniels says that at some point of time, which he does not fix, Mrs. Hammons claimed she had $1,500 or $1,600 in her pocketbook, but did not say whether money or notes.

William Samples says that March 3, 1878, he paid Mrs. Hammons interest money on Samples' note, and then she had quite a roll of bills in her pocketbook, which she said amounted to $400. Other witnesses say she told them shortly before her death that she had divided up her notes and money, and had but $50 or $60 left. Rea, administrator, says, when he paid her $200 in September, 1877, she said she was glad to get it, as she had been helping her children, and did not have money enough to pay Connor for land she had bought for Lewis.

We think the evidence fairly establishes that there was a division of the notes and personal effects of Mrs. Hammons a short time before her death. Four witnesses testify directly that there was. Two other witnesses say Mrs. Hammons told them she had made such division. There is no contradiction of this testimony except the witness Joseph Hammons. If this witness is given a degree of credit which in the light of all this testimony he is not entitled to, his testimony can not be said to outweigh the testimony opposed to him on this point. There is left the testimony of Mrs. Crawford and of Drew Bacon, which relates to admissions of Mrs. Connor that she had received money belonging to her mother's estate. We do not see how this evidence can be used to charge Matthew Connor.

We reach the same conclusion we did when this case was before us before, that there is no evidence in this record sufficient to support a finding that Matthew Connor embezzled or concealed, or wrongfully came into possession of any property belonging to the estate of Sarah Hammons, deceased.

Mrs. Crawford's testimony is to the effect that shortly after Mrs. Hammons died she had a conversation with Mrs. Connor about her domestic affairs, and that Mrs. Connor said she had thrown Matt's clothes out of doors, and he was sleeping in the barn, spoke as though he was getting away with her father's

estate, " but I have got $1,600 of mamma's money that Matt will never get his fingers on." This conversation she says she never had spoken of, except in her own family, until the summer of 1887, when she told it to Mrs. Julia Hammons. She admits there had been a good deal of bad feeling between her family and that of Connor since Mrs. Hammons' death. The testimony of Mrs. Rogers, that Mrs. Connor, in Mrs. Connor's house, told her, in 1882, when speaking of trouble between her and her husband, "that she had $1,500 or $1,600 in this house that she was determined Matt should not reap the benefit of," does not prove anything in this issue, because it is conceded that more than this sum of the money received by Mrs. Connor from her father's estate was paid upon the land and house where they lived.

Drew Bacon's statement is, that in 1879 he paid the Connors $20 on his note and that Mrs. Connor told him that they had divided the property, and Joe got money, I think. She said there was $800 of the old lady's money yet to collect that they had not divided. In former trials of this cause this witness did not mention this $800.

This is the testimony that is offered to the denial of Mrs. Connor that she got any money belonging to her mother's estate. The proof, as we have seen, is very conflicting, whether Mrs. Hammons, at or near the time of her death, had any such sum of money as $1,500. The decided weight of the testimony seems to be that she did not. If she did not have it, Mrs. Connor could not have embezzled it. Mrs. Connor says she did not get any money; Mrs. Crawford says she said she had $1,500 or $1,600 of her mother's money. Mrs. Connor denies that she made any such statement to Mrs. Crawford. In such state of case we do not think the evidence sufficient to charge Mrs. Connor with the embezzlement of $1,500 belonging to her mother's estate. This case has been tried three times in the trial court, and the litigation should have an end. To terminate the controversy, so far as we can do so, the judgment will be reversed and the cause not remanded.

*Judgment reversed.*